The next case on the call of the docket is Agenda No. 13, No. 126212, Cahokia Unit School District No. 187 et al. v. J.B. Pritzker, Governor of Illinois. Mr. Howard Gagin, Thomas Gagin. Good morning. I'm Thomas Gagin on behalf of Cahokia Unit School District and 21 other school districts, which are the plaintiff appellants in this case. May it please the Court, under Article 10 and the Equal Protection Clause of the Illinois Constitution, our simple one-sentence claim to this Court is that the State has a constitutional duty to provide the funding that the General Assembly itself deems necessary to meet the education that the State itself needs. And I'm speaking not just about the learning standards, which we refer to in our briefs. I could have brought in a small cart containing all of the learning standards that define the skills that students have to have at every grade level, the knowledge that they must have. But it's not just the learning standards in numbing detail that require this student. It's the fact that the students and the districts are assessed every year as to whether or not they are meeting those standards, and those assessments have great consequences. For the districts and the low-wealth districts that don't, on balance, have students meeting these standards, parents move out of those districts, the tax base falls, the funding capacity of those districts to meet the standards is diminished. They're even deeper in the hole than they were before. For the students, imagine getting an assessment year after year that you are partly exceeding, partly meeting standards, which is, in fact, a polite way of saying you're failing, year after year, at the same time that you see on the school report card that the school itself is failing. You're failing and the school is failing. That's an intolerable situation. And the legislature reacted to it after putting in these standards in 2010, which became the Common Core Standards. That's what the State Board of Education adopted. And after these consequences became obvious, the General Assembly stated there is a constitutional obligation, and there is no better case site for our claim than the text of Section 1 of the Evidence-Based Funding for Student Success Act, where the General Assembly makes it as clear as a bell that this is a constitutional obligation of the State, a constitutional obligation to provide these students with the education that they are entitled to. Under Article 10, explicitly referenced, that amount of money is not pulled out of the air. It's based on 32 practices, really teacher positions, librarians, school counselor, investments in gifted students that have been demonstrated by evidence in other states and in other situations to raise test scores. And when fully funded, these standards or these districts, when they are getting the full amount of funding required by the Evidence-Based Funding Student Success Act, they will have the capacity not to ensure that every student passes or meets standards or exceeds standards, no, but they will have the capacity to provide that education. And that's what this case is about. This case is about the constitutional obligation of the State to provide the capacity that the State itself deems necessary for these students, for these districts, I should say, to have, to be able to provide an education that is appropriate and commensurate with the detailed education that the State is now requiring. So what about Edgar? We're not here to ask this Court to overturn Edgar. To the contrary, we're here to ask this Court to recognize that Edgar said that this clause, which the Article 10, that the State shall provide an efficient system of high-quality public educational institutions and services, that this clause is not enforceable in the abstract, but it is enforceable. That's the implicit point of Edgar. It is enforceable, judicially enforceable, when there is a condition subsequent met. And that condition subsequent has been met. It is the creation of a standards-based education in detail that the districts and the students have to meet. And it is impossible to have that system in place, that standards-based education, which is here, whether anybody likes it or not, for the duration. It's not going away. It's here to stay. It's in 41 States. It's in every State. Federal law requires it, basically, under the ESEA. It's here to stay. When that system is in place, there is an obligation to provide some responsible method of funding. So in our view, not only has Edgar, that condition subsequent been met, but the learning standards have been defined, but it's gone beyond that. The learning standards have been defined. There are consequences for meeting the learning standards. Those consequences cause injury to the plaintiff districts and the students that they educate. And beyond that, the State itself has determined that there is a specific amount of money that is necessary to meet the constitutional obligation of the State to provide high-quality, a single system, and I should say this is an efficient system, a single system, not two systems, not three systems, not four systems. One single system of high-quality educational, public educational institutions and services. Scalia. Counsel, your prayer for relief throughout this case appears to be a little bit of a moving target. What do you propose a court order would look like that would come from this Court that would be enforceable? Well, a declaratory judgment is enforceable, and the first what we are seeking is a declaratory judgment. And we are seeking not to get an order from the General Assembly to make an appropriation. That's not what we're seeking. We're seeking a declaratory judgment that the Governor has an obligation to submit budgets that are consistent with the constitutional obligations of this State. And that the – in fact, that the full funding of this evidence-based funding act is a constitutional obligation of the State, and the Governor has to accept it as such. Our disagreement is not at this point really with the General Assembly. Our – we're here in this Court because we have a disagreement with the Governor. And what we are trying to do is to get this Court to delegitimate the Governor's position, which is there's no constitutional obligation, I don't have to do this, it's not a problem, and it's not going to do the students any good anyway because who knows if they'll have their test scores raised. We are here to get a declaratory judgment that the Governor is part of the State, and the State has a duty to provide high-quality educational institutions, and the Governor has a role to play in submitting a budget that is consistent with and commensurate with the goal that the General Assembly established of full funding by June 30, 2027. And we are nowhere – we are nowhere, nowhere close to meeting that goal. If the Governor puts that in the budget, how does the money get there? He needs the General Assembly. Of course he needs the General Assembly. And that is a different issue. But the Governor – But that's – And it's not – and the General – the Governor has a constitutional role under Article VIII, Section 2, and under statute to submit a budget that gives a roadmap to the General Assembly to go where the General Assembly ought to go. And the Governor is not giving that roadmap. Is this a two-step process? You ask this Court to order the Governor to put this in the budget, correct? We're asking this Court, first of all, to declare that the Governor has an obligation – that there is an obligation, and that the Governor, as the Chief Executive Officer, has a duty to comply with that obligation when he prepares a budget. Yes, that's what we're asking. And then the next step is to sue the General Assembly to say you put the money in for the Governor's budget? I don't think that we're ever going to do that. And the reason that I don't think that that's necessary is for the same reason as in Heaton v. Quinn, which this Court decided. There's no order that's going to the General Assembly. It's our view that the Governor – once the Governor has this res judicata determination that there is a constitutional obligation, we think the Governor will act accordingly. And we're not worried that the Governor is – we're worried about the Governor's conduct at this point. And that's where we are. This is going to be a long-term process. We understand that. Just like Brown v. Board, you aren't going to desegregate the schools overnight. We're realistic. We're not going to get to the $7.2 billion in an instant. There's no magic formula for it. But if the Governor is not trying, that has serious consequences. If the Governor doesn't care, if the Governor says there's no constitutional obligation, if the Governor says, well, it was zero last year and I'm going to do zero this year and now a couple days ago he changed his mind again, if the Governor is not on board, we're going nowhere in this state. So what we're trying to get this Court to do is to say that we're all part of this process, all three branches. The Governor is part of the state. The legislature is part of the state. This Court is part of the state. And this Court has an enormous impact on the budget of the General Assembly. And that the Court recognizes that the constitutional obligation to provide these public institutions that can provide the education that the state itself is requiring in assessing the districts we're not meeting, that that's just as important as any other constitutional obligation, including pension obligations, and that that is, that declaration, in our view, will go a long way toward a process where everybody's going to have to work together, the school districts, the legislators, the Governor's office, the State Board, to get to this goal. But it is more than a goal. It's an obligation. And that's what, that's why we're here before the Court. Counsel? Yes. Should the political question doctrine restrain this Court from ruling in your client's favor as set forth in Baker v. Carr by the U.S. Supreme Court? Baker v. Carr is not a bar to the enforcement of the constitutional obligation of the state. Except for questions. Yes, because there are discoverable standards as to what a high-quality education is. There is no undue interference, in our view, with any other branch. We're not asking for an order for an appropriation from the General Assembly. We're asking that the executive, that the chief executive who's responsible for the execution of the laws, carry out the goals of the 2017 Act. And there's no policy determination that this Court has to make. It's all in that first section of the 2017 Act. We can't — there is a policy determination made there that is as clear as a bell, and a statement of not just what a high-quality education is. The State Board does that in part under the common court standards. But there is a determination as to what the amount of money necessary to meet the constitutional obligation is. There's nothing for this Court to discover, to do, to determine. It's all there in the Act. But we're not seeking to enforce the Act. We are seeking to enforce the Constitution of the State itself, just as the General Assembly in 2017 was trying to enforce the Constitution by passing that Act. And that's why we don't think there's any Baker v. Carr problem here. Counsel, this problem has existed for a number of years, as you pointed out. It goes back to Brown v. the Board of Education. And you indicated that we didn't need to address Edgar. But Edgar says that education is not a fundamental right. Don't we need to start there before we can issue a declaratory judgment? I would say this, that whether or not education is a fundamental right, it is a fundamental right, a legal entitlement for the districts and the students to have the funding capacity that they need to meet the particular education that the State itself not just requires but judges them upon and has consequences. It has consequences as to whether they go on to post-secondary education. Whether or not there is a fundamental right to education in the abstract, there is absolutely a fundamental constitutional right not to be sanctioned, in effect, by the State. It's not – it's all done very politely. You know, it's all – you know, partly it meets standards, approaches standards, et cetera, et cetera. But everybody knows in the State – in the report cards that the State requires to be issued for these schools who's failing. And the students know that their schools are failing. And the students know they are failing. And they should know this, that at least one reason for it is that the State isn't giving them any money. In Edgar, the State – the court held that there was no fundamental right to education in the abstract. They didn't reach this issue because it never arose in Edgar. But I think if you go back and read Edgar, what the court was concerned about in that respect was to stay away from equality. They didn't want to say it was a fundamental right because then there would be equality in spending throughout the State. And the court felt that there was a liberty interest in the high-wealth district spending more. And we understand that. And that's part of the 2017 Act. There isn't a penny that is going to be taken away from the high-wealth districts, not one cent. And, in fact, this isn't going to end any disparity in funding between the high-wealth and low-wealth districts. In fact, it may well grow. But what it does do is it provides at least a minimum so that the students cannot – that the districts have the capacity – have the capacity to provide the education that is being required of every student of the State and under which everybody is being assessed now. So we're not interfering with that liberty interest that was identified by the court in Edgar. To that extent, local control still exists. And this Court should realize what is at issue here. Even though this sounds like a lot of money, and it is a lot of money, ultimately, this is a bare minimum. This is a bare minimum. These – they're going to be spending $26,000, $28,000, $29,000, $30,000. It's going to go up in the high-wealth districts. Mr. Gargan, on a more practical note, though, your declaratory judgment requires an actual controversy between the parties. What exactly is the actual controversy between the plaintiffs and the governor right now? Well, the actual controversy is laid out in the governor's brief. So the governor doesn't think there's any constitutional obligation. The governor is putting in either $350 million a year or zero a year in additional funding to meet this constitutional obligation. The governor is saying Edgar still applies and there's nothing enforceable, there's no obligation on the governor's part at all. So what we're asking this Court to do is to delegitimate that position and tell the governor, oh, no, there is an obligation, there is a constitutional obligation. And as executive, you have a role to play in submitting the budget that will achieve the constitutional obligations of these students. But you're not asking the Court or reporting the Court to decide a non-justicable political question, are you? I mean, sometimes it seems like that. We're asking the Court to carry out the obligation under the Constitution of the state of Illinois for the state to provide an efficient system of high-quality public educational institutions. And when I say, when we say state, we believe, with all due respect, the state includes the governor. And the governor is not doing that. And the governor is saying in this brief, I don't have that duty. Well, he does. And that's our position. Is this a constitutional right that runs to an individual or is it something that runs to this particular district? I would say the following, that this is a constitutional duty on the part of the State. And there is real and palpable injury to the point of districts and to the individual students. In connection with that's for Article 10, for our claim there. And in Article, under the Equal Protection Clause, we're just saying that the State cannot act arbitrarily. You know, it may be rational not to have equal spending throughout the state. We accept that. Perfectly rational. Edgar's right about that. But it's not rational to have a system where you are requiring students to meet or achieve state standards that are detailed and imposing consequences on those districts and students. And you are knowingly not providing them the money that is a necessary if not sufficient condition for meeting that. That, in our view, is not minimally rational. It makes no sense. Mr. Gagan, your time is up. Would you like to have any other questions? Wind up. Thank you. Thank you. Mr. Richard Hussage for the Governor. May it please the Court. I am Assistant Attorney General Richard Hussage, Counsel for the Defendant, the Governor of the State of Illinois in this case. And I urge this Court to affirm the lower court's dismissal of this action, because the wrong plaintiffs sued the wrong defendant on claims that lack merit in any event. I'd like to begin with the questions about the education article, which would provide a dispositive ground to cover this case in any future litigation. Plaintiffs' counsel could regroup with individual students, sue the comptroller and treasurer, then we'd be back here again. But I think the critical issue is, is there really any difference to set Edgar aside, distinguish it, overrule it, and say that it no longer governs the constitutional manner and responsibility for providing state funding for public education in Illinois? So the issue presented in this case under the education article is whether the Illinois Constitution gives the legislative branch of state government the exclusive and inalienable responsibility to provide state funding for public education. The answer to that question is yes. State funding for public education under our Constitution is a responsibility confided in the General Assembly, and it must exercise that responsibility through the traditional means of enacting appropriations for state support for local schools. I would like to, before elaborating on that point, take issue with the plaintiff's characterization that the governor doesn't care about state funding. He doesn't think it's important. He absolutely thinks it's important. One of the most important responsibilities of state government is to provide a free education for all students, to prevent the disadvantages that society has visited upon, the underprivileged, so that they have an opportunity to become functioning, responsible adult citizens and have economic opportunities, that those opportunities are not just left to those people who are born into families with greater means. The question isn't, though, whether more state funding is fair. The question is whose responsibility is it to fulfill that responsibility. And Edgar makes clear and the Constitution makes clear that that responsibility belongs to the General Assembly, and it implements that responsibility by enacting appropriations. And it has started to do so in a meaningful way with the evidence-based funding law. Now, that law isn't chiseled in stone. It doesn't set some set of standards that it can't revise based upon new information, feedback, experience that certain other things ought to be done differently, nor does it commit to a permanent level of funding by the state. It anticipates, consistent with the constitutional structure, that the appropriation process would be used as a means to fulfill the goals or targets in that law. That's the way the Constitution is designed. Isn't opposing counsel basically saying that's not being done? And that's why voters should go to the legislature and say, then give us more money, because it's the legislature's job to allocate the limited resources that the state has among competing priorities. But they did set targets of increases of $350 million a year in state funding for public education. And the first page of the supplemental appendix to the Acolytes Brief shows since 2015 it has increased over a period of six fiscal years state funding for public education by a massive amount. In the face of other competing priorities, the pandemic-related downturn in the economy had caused a pause in that. But luckily there was almost $8 billion of federal funding solely for local schools to help deal with that. But I think the answer to the question is not is the legislature living up to its obligation or not. I mean, it has a duty, but it's not one that's judicially enforceable under the Constitution so that the legislature says, we think it's a good idea to spend this much money on public schools, that then the courts can step in and bypass the entire appropriation process and commandeer public funds that haven't been appropriated and turn them over to the public schools. That would create a massive monkey wrench in the system as it was designed under the 1970 Constitution, as carefully explained in the Edgar case. For better or worse, political accountability for spending on public education lies at the feet of the legislature. The success or failure of what the legislature does is at its feet. And the last thing this Court needs to do is to itself become responsible for the success or failure of state funding on public education. That's a political function for which the political branches of government are answerable. It is not a judicial function. And there are aspects of the Constitution which, under the separation of powers and the political question doctrine, which is a manifestation of that, and the way that the Constitution is designed, there are certain issues that are not subject to adjudication by the courts. And this is one of them. In that line, ask a question about the rights of individual citizens, if any, under the education article. Justice Freeman wrote that Edgar shut the door to education article claims and Lewis E. nailed it shut. Do citizens have any rights under this article? I think the right is an aspirational one. It's the one that, as Dawn Clark Netsch, Senator Netsch, said at the time of the 1970 Constitution when she proposed the last clause of the education article, the primary responsibility clause, she said this doesn't impose a legal obligation on the state. This is fortitory. So there's no enforceable rights? Well, you hold up the education article to the legislature every time they go to enact appropriations and say, look, in the Constitution the people said this is something you need to do. So it's a political right. It's not a judicially enforceable right. I mean, not every right is judicially enforceable. There are, you know, examples of that in the Illinois Constitution, I suppose. So are you saying that article is just fortitory? Not every aspect of it. But the last clause of it, the primary responsibility clause that was the focus of the highly charged debate over whether the state had a responsibility to provide a certain level of funding for education, Senator Netsch made clear that it was fortitory. It did not create a judicially enforcing obligation. But it was important, nonetheless, to put into the Constitution. And that's true in a meaningful way. Look at what the legislature has now done. They have stepped up and they have significantly increased funding for public schools in a meaningful way based upon research that shows that certain techniques do result in better outcomes for the students. Now, this is a work in progress. The legislature is certainly going to revisit that. If there's another great recession, I hate to think what might happen with respect to the state's commitment to school funding in the face of other competing demands, the needs of people with disabilities, seniors and the like. But it is an obligation, if you will, but it is not a judicially enforceable duty or right. That is the nature of the political question. There's no role for the courts. What is the role of governor? The role of the governor is to be the elected representative of the people and to answer to the people for what he proposes in terms of school funding. And if they don't like what he does, at the ballot box he has to answer for that, like so many other responsibilities of the governor. But I will say this, and I know there were some questions directed to the relief sought in this case, is that three different types of relief have been sought against the governor. First, just grab money out of the state treasury and spend it, regardless of whether it's been appropriated. Well, I don't think that's consistent with the separation of powers and sovereign immunity, or as we've described in our brief. The second was, order him to include certain amounts in his budget that he proposes to the legislature. That is the quintessential violation of the separation of powers. The Washington Supreme Court's decision on this, I think, is revealing. The courts do not tell the governor what laws to sign or to veto or what to put in his budget. And so that's out of the question as well. That would be an extreme affront to the separation of powers under our system of government. And finally, the plaintiffs are asking for a declaratory judgment, but I don't know what that means. If they can't get the governor to spend money that has been appropriated and they can't order him to include things in his budget, that's a right detached from a corresponding duty. The classic example of a declaratory judgment is a fight between an insurance company and insured over coverage, where the court steps in and says, yes, there is coverage, or no, there is not coverage. And if it says there's coverage, then not only does the insured have a right, but the insurance company has a corresponding reciprocal duty. And here the plaintiffs aren't asking for any duty by the governor that is constitutionally permissible. They're just saying, well, we want you to tell the governor that we have a right. But if the governor doesn't have a corresponding duty, what type of declaratory judgment is that? That's an advisory opinion. That's a piece of paper that tells the governor you don't have to do anything. I don't see how that plays into the notion of adversity between parties that's necessary to support a declaratory judgment. So the governor is not the proper defendant. And for that reason alone, all of the relief that they seek against him is unavailable and the lower court's decision should be dismissed. We've laid out in our brief also the standing issues, and I'd be glad to answer questions about those as well. I do think, though, that the court, this is an opportune time for the court to address whether Edgar is still good law and whether it can be distinguished on the grounds that the plaintiffs present here. And their ground is that, yes, the legislature has a role to play, but it shares that responsibility with the courts. So that if the legislature does something that defines what is a high-quality education, and we dispute whether they've done that, but their theory is if the legislature defines what's a high-quality education, then they don't have to appropriate money. The courts just step in and enforce that without an appropriation. We disagree. An essential ingredient of the legislature's authority and responsibility is the sole power and the non-delegable power to determine how much state money should be spent for public education and to do so through the appropriation process. It is an inalienable role of the legislature to appropriate funds for public education according to their constitutionally assigned role to do so. They're not just some fact-finding body. The education article is not some machine lying dormant, where if the legislature says this is a high-quality education, then all of a sudden the machine comes to life and then creates some judicially enforceable right to a certain level of funding that the legislature doesn't have to appropriate. The legislature has to implement its responsibility through the appropriation process. That's what Edgar says. That's what the Constitution provides. That's what all of the debates at the 1970 Constitutional Convention established. And it is a role that the legislature, I am glad to say, has stepped up to in a serious way by increasing funding for public education, despite the many serious competing demands on state resources. I want to take issue as well with the plaintiff's contention that this is somehow unfair and that unfairness translates into a constitutional violation that the courts can remedy. They say that, well, the state has set standards, that students and schools are required to meet those standards, and as a constitutional matter, therefore, now the state has to provide the money for the schools and the students to achieve those. That's a misreading of the Constitution and of the relevant legal pronouncements by the General Assembly. The court said in the Cronin case that the state's role in funding schools carries with it naturally the right to expect some accountability for what's done. And what's the best way to measure that is to do occasional testing of the subjects that the students are learning, among others. That is math and reading, language arts and education. And so the state has given, the General Assembly has given the state board the power to set, you know, learning standards, which are expectations, they're not obligations on the students, they're expectations, and to do tests from time to time to determine how the students are performing. That's very helpful information. But the whole idea that there would be, you know, some type of, you give them the money, but you don't get to find out what they're doing with it or you don't get to measure the results, that would be a waste of an opportunity for the state to try and advance most effectively, as the Constitution says, efficiently, a system of public education. So I understand the plea that this is an unfunded mandate. It's not an unfunded mandate. The state is spending $8 billion a year on public education, and almost all of that money is going to the least affluent schools. The plaintiff school district, the first name plaintiff school district in this case, 80% of their money comes from state and federal sources, only less than 20% comes from local property taxes. That's untrue for the vast majority of other school districts. That's right, because that school district has less resources, and the state should devote more resources, and it should devote even more resources than it does now, subject to the legislative process of appropriations. So although we understand the plight, that's a fairness argument. It's not a constitutional argument that would warrant the courts stepping in and taking this major function away from the legislature to determine exactly how much should be spent for public education. Unless the court has additional questions, I would rest on my briefs, urge the court to affirm the lower courts. I ask it to address, again, the meaning of the education clause. The plaintiffs deserve credit for coming up with a sort of resourceful or clever argument that Edgar should be distinguished, and that Edgar says all the legislature has to do is to define a high-quality education, and the courts can take it from there and order the spending of unappropriated state funds. Well, there are a lot of moving parts in that process. That is a political process. It involves many policy choices that are best suited for the legislature. The legislature is fulfilling that function, and I urge the court not to step into this and take on the responsibility of taking control of funding of public schools. Thank you so much, Your Honors. Thank you, Mr. Hassell. May it please the Court. May it please the Court. Plaintiffs entirely agree that this is a political process, but the fact that it is a political process does not mean that there are not constitutional obligations involved, just as desegregation in this country was a political process, but it was And what is missing in the statement of my distinguished colleague is whether the Governor has any obligation for this. The Governor does have an obligation as part of this process to achieve what the General Assembly set out as a goal, to ensure constitutional rights. By June 30th, 2027. The opening sentence is the purpose of this section, and I'm reading from the Evidence-Based Funding for Student Success Act, is to ensure that by June 30th, 2027, and beyond, the State has a kindergarten through grade 12 public education system with the capacity, that's what we're focused on here, capacity, to ensure the educational development of all was Section 1 of Article 10 of the Constitution of Illinois. This is both a legal process and a political one, because there is obviously going to be some discretion involved in how you reach that goal. But the Governor has disregarded this and has abdicated his duty by putting in Governor 19, 2020, they proposed, and the legislature enacted, they proposed 350 million a year, which is the minimum funding under Section G of the Act. But that minimum funding is only there when the State is running out of money in some way. It's just like a sort of escape clause. It's a bottom line. The norm is to get to full funding by June 30th, 2027. That was the obligation. That's the goal that's set. Because the constitutional duty is being denied now, was denied in 2017, it was denied in 2018, it's being denied in 2021, and it will be denied in 2022. The State is out of compliance with its obligation. The idea of the General Assembly is to get the State into compliance by 2027. So how are we doing? Well, the Center for Tax and Budget Accountability estimates that at the current rate that we're proceeding, and given inflation in these numbers, which is going to change them, we're not likely to achieve this full funding goal until 2059. That is generations of children going through these low wealth districts and being assessed as not meeting standards because their schools don't have the capacity to provide that, that goes not just for the next 10 years or the next 20 years, but 30 or 40 years. That's what the governor is doing. And, in fact, he proposed zero funding in 2020, 2021, fiscal year 2021, which the General Assembly did, and mainly because, according to press accounts, I probably shouldn't say this, legislatures were so upset that he was going to do it again that he backed off. He does not take seriously his constitutional obligation to meet this goal by 2027, by 2037, or by 2047. And, hence, he is a major roadblock in achieving this constitutional obligation because he has the duty under Article VIII, Section 2, which is not, you know, beyond the jurisdiction of this Court to enforce, to submit budgets that are consistent with the constitutional duties of the State. And just as in the case of pension obligations, these are constitutional obligations of the State, as determined by the General Assembly, so long as there is this condition subsequent, so long as the State is requiring standards-based education, so long as the State is assessing these students, as it should do. We're not objecting to that. It should assess them, because standards ultimately raised are good for low-income students. They're good for them. They should be assessed. They should be held accountable. But they should be held accountable fairly. And this just is a denial of fundamental fairness, not because there's a right to education in the abstract, but because there's a right, a fundamental right to education, to achieve this specific education under which these students are being judged, and it determines their life chances. So.   Thank you.